**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
ANNE DI IORIO,

                *Plaintiff*,

             -against-

THE COUNTY OF SUFFOLK,

                *Defendant*.
-------------------------------------------------------------X

                           **MEMORANDUM**
                           **AND ORDER**
                         21-cv-01273 (JMW)

**A P P E A R A N C E S:**

Yale Pollack, Esq.
**Law Offices of Yale Pollack, P.C.**
66 Split Rock Road
Syosset, NY 11779
*Attorney for Plaintiff*

Hope Senzer Gabor, Esq.
**Suffolk County Department of Law**
100 Veterans Memorial Highway
Hauppauge, NY 11788
*Attorneys for Defendant*

**WICKS**, Magistrate Judge:

      Emergency 911 dispatchers . . . serve the critically important role as gatekeepers of emergency response. They are, in the truest sense, the *first* link in the chain of first responders that answer the call for emergency services. They are the lifeline between the caller—who perhaps is experiencing the worst day of his or her life—and the police, fire, and other responding departments. Clear, effective communication is the hallmark of a good [dispatcher]. They ensure that the correct departments and agencies get dispatched and assist in ensuring that all go home safely. They are, indeed, the calm in the storm.[1]

---

[1] *Chodkowski v. County of Nassau*, 16-CV-5770 (JMW), 2021 WL 3774187, *1 (E.D.N.Y. Aug. 25, 2021).

Plaintiff Anne Di Iorio, ("Plaintiff"), a former dispatcher, commenced this suit against Defendant The County of Suffolk ("Defendant," "Suffolk," or the "County"), alleging violations under Title I of the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq.*, ("ADA"), and New York State Human Rights Law, N.Y. Executive Law § 290, *et seq.* ("NYSHRL") (ECF No. 1 at ¶ 1.) Specifically, Plaintiff asserts claims against Defendant for: (i) failure to accommodate under Title I of the ADA ("Count I"); (ii) failure to accommodate under the NYSHRL ("Count II"); (iii) intentional discrimination under Title I of the ADA ("Count III"); (iv) intentional discrimination under the NYSHRL ("Count IV"); (v) retaliation under Title I of the ADA ("Count V"); (vi) retaliation under the NYSHRL ("Count VI"); and (vii) disparate impact discrimination under Title I of the ADA ("Count VII"). *See generally*, ECF No. 1.

Plaintiff alleges that she was forced to retire from her position as a Public Safety Dispatcher from the County's 911 Call Center in Yaphank, following the County's implementation of a mandatory overtime policy for 911 Call Center employees, of which she was unable to comply with due to her medical condition. (*Id.* at ¶ 12, 21, 45.) Following completion of discovery (ECF No. 27), the County requested leave to file a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, which was subsequently granted by the undersigned. (ECF No. 32.)[2] Now before the court is Defendant's Motion for Summary Judgment on all Counts asserted in the Complaint (*see* ECF No. 34), which is opposed by Plaintiff (ECF No. 35.) For the reasons stated herein, Defendant's Motion (ECF No. 34) is **GRANTED** on all Counts.

---

[2] The parties consented to the undersigned's jurisdiction for all purposes on May 26, 2021. (*See* Electronic Order dated May 26, 2021.)

# BACKGROUND

## I.    Factual Background

The following facts are drawn from the parties' Local Rule 56.1(a) Statements and are uncontested unless otherwise noted.[3]

### A.    Public Safety Dispatcher Roles

Plaintiff began her employment with Defendant at the Suffolk County Police Department ("SCPD") as a Public Safety Dispatcher ("PSD") I in 1997.  (ECF No. 34-1 at ¶ 1.)  Her position was always a PSD I until her retirement in 2014.  (*Id.* at ¶ 2.)[4]  A PSD I was a desk job that entailed obtaining information from 911 phone operators and dispatching it to the police.  (*Id.* at ¶ 6.)  Specifically, in Plaintiff's PSD I Job Description, it is noted that the duty of a PSD I is to:

> Operate[] a two-way radio communication system to dispatch public safety personnel to calls for assistance. May operate a telephone switchboard or complaint receiving system which receives requests from the public for police or other public safety assistance.

---

[3] The facts set forth above are taken from the parties' respective Rule 56.1 Statements. *See* ECF Nos. 34-1, 34-19, 35.  Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement means that the Court has deemed the underlying factual allegation undisputed.  Any citation to a Rule 56.1 statement incorporates by reference the documents cited in it.  Where relevant, however, the Court may also cite directly to an underlying document.  The Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal.  *See Stewart v. Fashion Inst. of Tech.,* No. 18-CV-12297 (LJL), 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("'[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record.'") (quoting *Knight v. N.Y.C. Hous. Auth.*, No. 03-CV-2746 (DAB), 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."). "Additionally, to the extent [a party's] 56.1 statement 'improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts,' the Court has disregarded [such] statement[s.]"  *McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020).

[4] Plaintiff applied for service retirement effective September 18, 2014. (*Id.* at ¶ 4.)

(ECF No. 34-19 at ¶ 2.)[5]

PSD Is are supervised by PSD IIs, who oversee the 911 operators and police dispatchers, staffing, and scheduling. (ECF No. 34-1 at ¶ 7.) Specifically, PSD IIs are floor supervisors who assign priority overtime, "take care" of the mandates, take calls for people who are calling in sick, assist dispatchers in getting their calls outs, and monitoring all employees on the floor. (*Id.* at ¶ 8.)  PSD IIIs are involved in overseeing the operations of the 911 operators and the dispatchers, with the added responsibility of being a liaison to the command staff and tracking of all events, and they report to either a police lieutenant or captain, or a deputy inspector, depending upon who is assigned at any particular time. (*Id.* at ¶¶ 9-10.)  Jennifer Devine was additionally hired as a PSD I in 1997 and served as a radio partner with Plaintiff when they were both PSD Is. (*Id.* at ¶¶ 13-14.) Ms. Devine was promoted to PSD II in 2010 and subsequently to a PSD III.  (*Id.* at ¶¶ 12-13.)  From 2010 until 2014, Ms. Devine served as Plaintiff's supervisor. (*Id.* at ¶ 29.)  Jeremy Sommeso was hired by as a PSD I in 1998.  (*Id.* at ¶ 15.)[6]  He was first promoted to a PSD II, and then in 2013 he received a provisional appointment to PSD III.  (*Id.*)  In 2015, Mr. Sommeso was appointed to a permanent PSD III position.  (*Id.*)

---

[5] Defendant explains that "[t]he SCPD Communications Section is a 365 day a year, 24 hour per day, 7 day a week unit, meaning that is fully operational and must be staffed at all times." (ECF No. 34-1 at ¶ 53.) In the unit, there is a PSD assigned to every radio band in Suffolk County, and, in addition to the PSDs that are actively on the radio, the Communication Section requires that there are additional PSDs on duty, to ensure that the PSD's working the radios are able to take a break or a meal period. (*Id.* at ¶ 54.) According to Defendant, "[t]he radios must be manned at all times." (*Id.*) Jennifer Devine, currently employed by SCPD as a PSD III, testified that department "could not leave unfilled seats-in order for the command to run, those seats had to be filled, and those seats could be filled with either volunteers, [overtime] mandates, or the possibility of hiring additional personnel." (ECF No. 34-19 at ¶ 74.)
[6] When Jeremy Sommeso was hired as a PSD I, Plaintiff trained him. (*Id.* at ¶ 16.)

B.      **SCPD Overtime Provisions and Policies**

The parties dispute how overtime for a PSD I position was administered. *See* ECF No. 34-19 at ¶ 9.  According to Defendant, "there has been an overtime mandate in the [SCPD] since at least 1998, when [Mr.] Sommeso was hired." (ECF No. 34-1 at ¶ 16.)[7] Defendant explains:

> A mandate is utilized when there are not enough PSD I's to reach minimum staffing levels and there are no volunteers to work an overtime period to meet those minimum staffing levels. Employees are then mandated to stay for that overtime. There has always been mandatory and voluntary overtime. First, employees are canvassed for voluntary overtime. If there are no employees who volunteer for the overtime, then an employee is mandated to either stay past their shift or come in early before their shift.

(*Id*. at ¶ 19.) Defendant states that working mandated overtime "is a core function of the job of a PSD I, since the 911 [C]all [C]enter is an emergency operations center" and that "[i]n order to keep the emergency operations functional staffing must be maintained[,]" which is "discussed at orientation when PSDs are hired." (*Id*. at ¶¶ 22, 24.) According to Defendant, "the overtime mandate occurs when the squad runs out of employees who volunteer for overtime and there are still positions that need to be filled in order to keep the department running." (*Id*. at ¶ 23.) The mandates are for an additional 4-hour shift, either prior to or following a PSD I's regular 8-hour shift. (*Id*.) Defendant further explains that between approximately 2010 and 2014, the SCPD implemented two different methods of mandating overtime:

> Closer to 2010, a chart was maintained that would track an individual's mandatory overtime. If that individual had not worked a mandatory overtime shift further back than everyone else, then that individual was up for mandate. Sometime after 2010, it transitioned from the last date worked, so if an individual had the furthest date for voluntary or mandated overtime, that person was mandated. In cases of a tie, seniority would be a factor; if two employees had the last date of mandated overtime, then the less senior employee would be the first mandated and the more senior would be the second one to be mandated.

---

[7] Defendant notes that Ms. Devine worked both voluntary and mandated overtime during the time that she was a PSD I. (*Id.* at ¶ 21.)

(*Id*. at ¶ 20.) Defendants claim that "Plaintiff was mandated to work overtime between 1997 and

2013." (*Id*. at ¶ 25.)[8] By contrast, Plaintiff asserts that when she began her employment, overtime

was voluntary.  (ECF No. 34-19 at ¶ 9.) In making that assertion, Plaintiff relies on the overtime

provision of the Collective Bargaining Agreement, effective from January 1, 2004 to December

31, 2008 (the "CBA"), entered into between the SCPD and the Suffolk County Association of

Municipal Employees, Inc.[9], which provides, in relevant part:

> 6.2 Equalization of the Opportunity for and Obligation to Perform Overtime. Overtime
> work, as an opportunity, in the same or related title shall be equalized among
> Departmental employees as far as is practical. Department Heads and supervisors may
> require the performance of overtime or "called-in" work for reasonable periods as an
> obligation in cases where, because of seasonal or extraordinary requirements related to
> the job or because of the absence of normal personnel for whatever reason, the work is
> necessary to meet the normal work demands of the function of the Department or some
> emergency exists. Seniority shall be a criterion in the selection of employees for
> overtime, provided that the employees have the ability to do the work.
>
>             ***
>
> 8. TIME FOR PERFORMANCE OF SERVICES
> 8.1 Work Week/Work Day
> No individuals shall be required to work more than a normal 40-hour workweek (e.g., in
> a work location where employees currently work a normal 40 hour workweek due to
> "lock-in," new employees would also work the same 40 hours).

(*Id*. at ¶ 6-8; ECF No. 35-5 at 9-15.)

The SCPD additionally issues "Department Directives," which contain, in-part,

"procedures and parameters . . . concerning the assignment of overtime." (ECF No. 34-1 at ¶ 28.)

Department Directive Order Number 2009-17, effective October 6, 2009 (hereafter, the "2009

SCPD Department Directive"), contains the Subject/Topic/Title "Civilian Overtime

---

[8] Defendants note that "[t]here was never a time before 2013 that Plaintiff was mandated to work
overtime that she did not work the overtime." (*Id*. at ¶ 25.)

[9] At Oral Argument on Defendant's Motion before the undersigned, Defendant clarified that the CBA
applies generally to all Suffolk County civil servants, and is not specific to the SCPD or its
Communications Unit in which Plaintiff was employed. (ECF No. 36.)

Distribution[,]" and was in effect during the time of Plaintiff's employment. (*Id*.)[10] The 2009

SCPD Department Directive provides, in relevant part:

> 3. [Emergency Complaint Officer ("ECO")] Overtime: on duty ECO's will be given preference when ECO positions are available. If unable to fill with on duty ECO, proceed to on duty PSD. If unable to fill with on duty PSD, proceed to on duty PSD II.

> 4. PSD Overtime: on duty PSDs/PSDIIs will be given preference when PSD positions are available.

> 5. If vacancies still exist, personnel on [Regular Day Off ("RDO")] will then be hired. Off-duty personnel should be hired for a full eight (8) hour tour if available. Additional recall overtime should be avoided when possible. As above, off duty ECOS' will be given preference in filling ECO vacancies. An employee may not work overtime while they are on sick leave.

> 6. Employees will not be requested to work more than twelve (12) hours unless vacancies still exist and all other options are exhausted. If this should be necessary, the Duty Officer and PSDIIs will monitor such individual(s) for performance deterioration. If deterioration is observed, the employee is to be immediately relieved from duty.

> 7. In the event of extenuating circumstances, the Duty Officer may use his / her discretion to override this directive in order to maintain adequate staffing. If this occurs, the Duty Officer will so advise the Commanding Officer in writing that this directive was overridden and the reasons for the same.

> On duty personnel will have one (1) hour from the start of their tour to sign up in the Overtime Log.

(ECF No. 34-7 at 2-3.)

On January 11, 2013, SCPD issued a memorandum regarding mandatory overtime (the "Overtime Mandate Memo"), which stated no employees would be excused from overtime since overtime was part of the PSD position.  (ECF No. 34-19 at ¶ 14.)  If an employee could not work overtime, they were deemed unfit for duty.  (*Id*.)  If an employee "push[ed] the issue," Civil Service 72 proceedings could be implemented, including termination.  (*Id*.) The Overtime Mandate Memo specifically stated:

---

[10] Defendants note the 2009 SCPD Department Directive "was superseded on October 7, 2014, after Plaintiff had retired from the County." (*Id*.)

> As per Paul Margiotta of Labor Relations, no employee will be excused from overtime. The overtime is part of the position. If they can't work overtime, they are unfit for duty and therefore cannot work their normal shift. If the employees push the issue, Civil Service Section 72 (unfit for duty and the employee will be forced to be absent for up to 1 year) proceedings *can be* implemented. The end result would be termination.

(ECF No. 35-7 at 1) (emphasis added).[11] According to Mr. Sommeso, there were no medical exemptions allowed.  (*Id*. at ¶ 15.) SCPD subsequently sent the Overtime Mandate Memo to Suzanne McBride, Plaintiff's Union representative, and others to implement on January 12, 2013. (*Id*. at ¶ 16.)

### C.   Plaintiff's Medical Leave and Request for Accommodation

Plaintiff went out on medical leave in May 2013. (*Id*. at ¶ 17.) Approximately one-year later, in May 2014, the SCPD's Office of Labor Relations advised that Plaintiff would be allowed to return to work, but that they were to "make no special accommodations" and noting that Plaintiff claimed the obligation to work "OT" would "not be a problem" and therefore Plaintiff would be "returning full duty no restrictions." (*Id*. at ¶ 19; ECF No. 35-10.) Plaintiff returned to work on May 25, 2014, where she resumed her role as PSD I. (*Id*. at ¶ 21.) Prior to returning to work, on or about May 15, 2014, Plaintiff provided a letter from her doctor to SCPD, which stated as follows:

> Ms. Di Iorio was treated by Dr. Siebel at Memorial Sloan-Kettering Cancer Center for Head & Neck cancer with chemotherapy and radiation. She suffers from damage to salivary glands from treatment. Her voice capacity is limited. She is also having difficulty with kidney function related to chemotherapy. Her return to work is at her request; however, she should not exceed eight-hour shifts.

(*Id*. at ¶ 22.) Upon Plaintiff's return to work, she was issued overtime mandates by her supervisors, such as Ms. Devine. (*Id*. at ¶ 28.) As a PSD II, Ms. Devine was responsible for assigning mandates, along with other PSD IIs and PSD III floor supervisors. (ECF No. 34-1 at ¶

---

[11] Plaintiff conceded at Oral Argument that she never initiated Civil Service Section 72 proceedings prior to her retirement. (ECF No. 36.)

8

26.)  When an employee wanted to report an issue related to their employment, Ms. Devine, in her capacity as PSD II, would ask that employee to write an internal correspondence, also known as a "1042," which is addressed to the commanding officer or executive officer, and submitted to them by Ms. Devine. (*Id*. at ¶ 32.) Specifically, when an employee did not want to work mandated overtime, they were required to submit a 1042 form. (*Id*. at ¶ 34.)[12]

When Plaintiff was mandated overtime, she would advise her supervisors that she could not work the overtime hours as per her doctor's orders. (ECF No. 34-19 at ¶ 30.)  In response, SCPD required Plaintiff to start writing internal correspondence to submit to her superiors. (*Id*. at ¶ 31.) Despite advising of the fact that she was unable to work the overtime mandates due to Plaintiff's doctors' orders, the SCPD continued to implement mandates upon Plaintiff. (*Id*. at ¶ 35.)[13] On August 28, 2014, Plaintiff filled out a union Grievance Form. (ECF No. 34-12.) In the Grievance Form, Plaintiff notified the County:

> Prior to my return to work from medical leave on May 25th I was required to submit a Doctor's note which stated I could return to full duty but that I should not work more than eight (8) hours. On June 27th I was informed by supervisors Sandi Flammer, I was being mandated to work 4 hours overtime… Again on August 2, 2014, I was informed by my supervisor Jennifer Devine that I was being mandated to work 4 hours overtime. As per long standing department policy to exempt those with document medical issues from mandatory overtime,[14] my rights have been violated.

---

[12] Defendant notes that Ms. Devine "specifically testified that any time an employee requested an accommodation, the employee was told to write a 1042 (internal correspondence) to the back administration office." (ECF No. 34-19 at ¶ 33.)

[13] Plaintiff wrote internal correspondence to Capt. Kevin Degnan of the SCPD on June 27, 2014 and August 3, 2014, advising him that she "did not physically feel up to overtime" and that she was "unable to work mandated overtime . . as per [her] Doctors orders." (ECF Nos. 34-10, 34-11). Plaintiff did not work the mandated overtime on June 27, 2024 or August 3, 2014, and someone else was mandated on those days. (ECF No. 34-1 at ¶¶ 39-42.) Plaintiff was not disciplined for refusing to work the overtime on either day. (*Id*.)  As reflected in Plaintiff's time sheets from May 25, 2014 (when she returned from sick leave) and September 18, 2014 (the effective date of her retirement), she did not work any overtime. (*Id*. at ¶ 44.)

[14] Defendant notes that when Plaintiff returned from medical leave, this "past practice" was not in effect – rather, as per the Overtime Mandate Memo, no employee was exempt from overtime. (ECF No. 34-19 at

> I request that a reasonable accommodation be made to be exempted from mandated overtime as per pact practice until such time as my doctor clears me to work more than eight (8) hours per shift, and to be made whole.

(*Id.*) The Grievance Form was submitted to Ms. McBride as the union representative, however, the parties dispute whether or not the grievance was ever actually filed with SCPD. (ECF No. 34-19 at ¶ 43; ECF No. 34-4 at 32.)[15]

### D.   Plaintiff's Retirement and EEOC Charge

When "no action was taken [by the SCPD] but the [overtime] mandates continued[,]" Plaintiff asserts she "vested her benefits with the SCPD." (ECF No. 34-19 at ¶ 44.) Plaintiff subsequently filed for Service Retirement and retired from her employment with the County effective September 18, 2014. (ECF No. 34-1 at ¶ 50.) Following her retirement, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which determined that there was "probable cause" that SCPD violated her rights under the law. (ECF No. 34-19 at ¶ 47.) Specifically, the EEOC found:

> A review of the evidence received during our investigation suggest [SCPD] by way of policies enacted in 2012 and 2013 restricted and or denied [Plaintiff's] right to request and obtain a reasonable accommodation. Furthermore, by refusing to address any request for reasonable accommodation[,] [the SCPD] failed to engage in the interactive process in violation of the ADA. Based on the above, [SCPD's] asserted defense does not withstand scrutiny and the Commission has determined that there is reasonable cause to believe that [SCPD] has discriminated against [Plaintiff] on the basis of disability in violation of the Americans with Disabilities Act.

(*Id.* at 48.)

---

¶ 41.) Defendant additionally notes that Plaintiff testified that when she returned to work on May 25, 2014, no one was excused from working the mandated overtime. (*Id.*) (citing ECF No. 34-4 at 35).

[15] Defendants assert that "[a]s per Plaintiff's testimony, the [G]rievance [Form] was submitted to McBride as a union representative, and was not submitted to the SCPD." (*Id.*) When asked whether the Grievance Form was filed with the SCPD, Plaintiff responded that she "never followed up with it." (ECF No. 34-4 at 33.) At Oral Argument, Defendant reiterated that the Grievance Form was never filed with the SCPD, and Plaintiff conceded that she filled out the Form, but did not confirm the Form was submitted to the SCPD. (ECF No. 36.)

## II.    **Procedural History**

Plaintiff originally filed the Complaint in this action on March 10, 2021, alleging: (i) failure to accommodate under the ADA and the NYSHRL, (ii) intentional discrimination under the ADA and the NYSHRL, (iii) retaliation under the ADA and NYSHRL, and (iv) disparate impact discrimination under the ADA. (ECF No. 1.) Following the end of all discovery, the County requested leave to file a motion for summary judgment on all Counts asserted in the Complaint (ECF No. 28), which was granted by the undersigned on July 21, 2023. (ECF No. 32.) Suffolk subsequently moved for summary judgment with respect to all counts asserted in the Complaint.  (*See* ECF No. 34-2.)  Plaintiff filed their Opposition to Defendant's Motion (ECF No. 35), and Plaintiff filed its Reply (ECF No. 34-18) on January 26, 2024. On April 29, 2024, the parties appeared for an Oral Argument on Defendant's Motion before the undersigned. (ECF No. 36.)

## III.    **The Parties' Contentions**

### A.    **Defendant's Motion for Summary Judgment**

In support of its Motion for Summary Judgment, Defendant argues: (i) Plaintiff's discrimination claims under the ADA must be dismissed because (a) Plaintiff cannot state a *prima facie* case of discrimination under the ADA, as she could not perform an essential function of her job, and did not otherwise suffer an adverse employment action due to her alleged disability, (b) her disparate impact claim fails as a matter of law, and (c) Defendant had a legitimate justification for its actions, and Plaintiff cannot prove that it was merely pretext and the real reason was discrimination; (ii) Plaintiff cannot state a claim for retaliation; and (iii) this Court should not find pendent jurisdiction on the state claims, which apply the same standard. (ECF No. 34-2 at 2.)

11

*First*, Defendant argues that Plaintiff, by her own admission, could not, with any accommodation, perform an essential function of her job – working mandated overtime (*e.g.*, when mandated, Plaintiff could not work an additional 4 hours prior to or following her shift). (*Id*. at 17.) Defendant asserts the Communications Section where Plaintiff worked as a PSD I, dispatching emergency 911 calls to police precincts, "always had to be fully-staffed on a 365 day a year, 24 hour per day, 7 day a week basis[,]" and, "[t]herefore, an essential function of Plaintiff's job was the ability to work overtime." (*Id*.) Defendant maintains that "since Plaintiff alleges that the only accommodation that would satisfy her would be to eliminate her essential job responsibility of working mandated overtime," her accommodation request "[is] clearly unreasonable." (*Id*. at 18.)[16]

Defendant additionally contends that Plaintiff did not otherwise suffer an adverse employment action due to her disability. (*Id*. at 19.) Defendant maintains that Plaintiff was never disciplined for her refusal to work mandated overtime, and, on the two occasions where she was mandated to work overtime following her return from medical leave, she was "merely requested to write an internal correspondence explaining why she could not work overtime[,]" and subsequently "unilaterally decided to retire with her full pension[,]" which do not constitute "adverse employment actions." (*Id*.) Defendant argues Plaintiff's disparate impact claim additionally fails as a matter of law because Plaintiff has not proffered any evidence to prove disparate impact, as she has presented no statistical evidence nor made any comparison between groups in order to determine if an alleged protected group has been impacted differently than the other group of individuals. (*Id*. at 20.) Finally, Defendant contends that even if the Court finds

---

[16] In making this argument, Defendant primarily relies on the Eighth Circuit's decision in *McNeil v. Union Pacific Railroad Company*, 936 F3d 786, 790 (8th Cir 2019).

Plaintiff made a *prima facie* case of discrimination, the County has nevertheless "set forth legitimate, non-discriminatory reasons for it actions in dealing with Plaintiff." (*Id*.)

Defendant maintains that working overtime is an essential function of the job of a PSD I, from which no employee was excluded, as indicated in the 2009 SCPD Department Directive, and reinforced by the Overtime Mandate Memo, which asserted that no employee would be excused from overtime, as it is a part of the position, and that in order for the unit where Plaintiff worked as a PSD I to be properly staffed at all times, overtime was mandatory for all unit employees. (*Id*.) Defendant further claims that Plaintiff was niether singled out nor discriminated against, as every employee was treated the same and the overtime mandates applied universally to all employees. (*Id*.)

*Second*, Defendant argues Plaintiff cannot state a claim for retaliation because she neither engaged in a protected activity nor suffered an adverse employment action. (*Id*. at 22.) Defendant states that while she refused to work two overtime mandates, she was not disciplined for her refusal to work them, rather, it was her "decisions to voluntarily retire." (*Id*.)[17] *Third*, Defendants assert that "[a] claim of disability discrimination under the New York State Human Rights Law is governed by the same legal standards as govern federal ADA claims[,]" and, therefore, "for the very same reasons that the substantive claims of ADA disability discrimination and retaliation under federal law must be dismissed, [Plaintiff's] state claims for the same causes of action must also be dismissed." (*Id*.) (quoting *Graves v. Finch Pruyn & Co., Inc*., 457 F3d 181, 184 n. 3 (2d Cir 2006)).

---

[17] Defendant additionally notes that while Plaintiff filled out a Grievance Form, she testified that she could not recall if it was ever filed with the County by the Union. (*Id*.)

B.    **Plaintiff's Response in Opposition**

In her Opposition, Plaintiff argues Defendant's Motion for Summary Judgment on Plaintiff's disability discrimination claims must be denied because: (i) Plaintiff suffered from a disability within the meaning of the ADA (*e.g.*, cancer), (ii) she performed the essential functions of her job, (iii) she suffered an adverse employment action as a result of Defendant's conduct when she was "constructively discharged" from her employment, (iv) Defendant failed to accommodate her disability, and (v) Defendant retaliated against her. (ECF No. 35-1 at 16.)

With respect to her essential function argument, Plaintiff contends that "Defendant's faulty premise is that working overtime was an essential function of a PSDs job, which is a wholly conclusory statement." (*Id.*) Plaintiff notes that neither the CBA nor the PSD I Job Description states that a PSD I is required to work a certain number of hours as part of his or her job, or that working overtime is an essential function of the job. (*Id.* at 17.) Plaintiff maintains that she "was able to perform the functions of the PSD position, just as she had been able to from the commencement of her employment in 1997[,] until she was constructively terminated in 2013." (*Id.*) Plaintiff further states that her doctor's requested a reasonable accommodation for her excusing her from working in excess of eight hours per day, which was denied by Defendant, and, as a result, "Plaintiff has established that she could perform the essential functions of her job, whether with or without a reasonable accommodation." (*Id.*)

With respect to her constructive discharge argument, Plaintiff argues that "[s]ince Defendant confirmed in the Overtime Mandate Memo[] that those refusing to work the mandates would be subject to discipline and termination, Plaintiff was not required to wait around for her inevitable termination, so she chose to resign to retain the benefits that she otherwise may not have received once she was terminated." (*Id.* at 18.) Plaintiff maintains that she has therefore

14

"satisfied the element of enduring an adverse employment action by having her employment constructively discharged." (*Id.*)

As to her failure to accommodate claim, Plaintiff argues that "Defendant's entire theory of this case is that working mandatory overtime was an essential function of [her] job, which is belied by the documentary evidence discussed above, including the Job Description and CBA." (*Id.* at 19.)[18] Plaintiff argues that Defendant, "as an employer, is not in the position of stating whether a certain job function is an essential as it is simply a factor a Court can consider." (*Id.*) Plaintiff further argues that Defendant "unequivocally failed" to provide her with a reasonable accommodation. (*Id.* at 20.)

Finally, as to her retaliation argument, Plaintiff claims she engaged in protected activity when she repeatedly submitted doctor's notes requesting that she be limited to an eight-hour working day, and "Defendant clearly had knowledge of these notes and restrictions." (*Id.* at 22.)[19] Plaintiff additionally claims that she "expressly complained about being subjected to a hostile work environment, leading to a Grievance to be filed on her behalf. . . . [and] [a]fter the Grievance was filed, additional mandates were imposed on Plaintiff, which would have resulted in her termination if she continued to refuse same." (*Id.* at 23.) She maintains that "[t]he timing

---

[18] In support of her argument that mandated overtime was not an essential function of her job, Plaintiff primarily relies on: (i) *Lewis v. Livingston County Ctr.*, 30 F. Supp.3d 196 (W.D.N.Y. 2014), (ii) *Wilkie v. Luzerne Cnty.,* No. 3:14CV462, 2016 WL 4921032, at *1 (M.D. Pa. Sept. 14, 2016), and (iii) *Colpoys v. County of Erie*, 2013 WL 5437635 (W.D.N.Y. Sept. 27, 2013). (*Id.* at 19-20.)

[19] Plaintiff relies on *Reeder v. Cnty. of Wayne*, 177 F. Supp. 3d 1059, 1077-78 (E.D. Mich. 2016) to support the proposition that submitting doctor's notes along with requests for mandatory overtime accommodations constitutes a "protected activity" under the ADA. *Id*; *see Reeder*, 177 F. Supp. 3d at 1081 (E.D. Mich. 2016) ("[S]ince Plaintiff has presented evidence that he submitted doctors' notes in order to request the accommodation of being excused from mandatory overtime, he can be considered to have engaged in a protected activity under the ADA and PWDCRA.").

between the Grievance filing and her termination supports a causal connection between her protected activity and adverse employment action." (*Id*.)

### C.   **Defendant's Reply**

In its Reply, Defendant reiterates that mandated overtime always was and still is an essential function of the job of a PSD. (ECF No. 34-18.) Defendant claims that "[d]ue to staffing issues which occurred before Plaintiff returned from leave in May 2014, every PSD, without exception, was required to work the overtime." (*Id*. at 1.) Defendant argues the CBA's provisions stating that "Department heads and supervisors may require the performance of overtime or 'called-in' work for reasonable periods as an obligation in cases where, because of seasonal or extraordinary requirements related to the job or because of the absence of normal personnel for whatever reason, the work is necessary to meet the normal work demands of the function of the Department or some emergency exists[,]" specifically undermines Plaintiff's argument that overtime was not an essential function of a PSD I position based on the language contained in the CBA. (*Id*. at 2.)

Defendant further maintains that Plaintiff did not suffer any adverse employment action, as "it is undisputed that Plaintiff voluntarily retired from her employment with the County effective September 18, 2014." (*Id*. at 3.) Defendant argues that the Court should not consider Plaintiff's constructive discharge claim because she failed to assert it in the Complaint. (*Id*.)[20]

---

[20] Defendant is correct that Plaintiff did not plead a cause of action for constructive discharge in her Complaint and is raising constructive discharge for the first time in her Opposition to Defendant's Motion for Summary Judgment. *See* ECF Nos. 1, 35-1. The Court notes that "[i]t is black letter law that a party may not raise new claims for the first time in opposition to summary judgment." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 278 (S.D.N.Y. 2010) (collecting cases); *Thomas v. Egan*, 1 F. App'x 52, 54 (2d Cir. 2001) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion."). Nonetheless, it addresses Plaintiff's constructive discharge claim below. *See infra*, Section II.B.

16

Finally, Defendant argues that it did not retaliate against Plaintiff. (*Id.* at 4.) Defendant argues that the Grievance Form was never filed on Plaintiff's behalf, and therefore, "she could not have been retaliated against on that basis." (*Id.* at 5.) Further, Defendant contends Plaintiff testified that she retired from the County before she could ascertain if the Grievance was ever filed, and thereafter, never followed up. (*Id.*) Defendant maintains that Plaintiff "did not suffer an adverse action; she was never disciplined for refusing to work mandated overtime, and it was solely her decision to voluntarily retire." (*Id.*)[21]

### DISCUSSION

## I.   Summary Judgment Framework

In order to obtain summary judgment, the movant must demonstrate there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim.  *Celotex Corp. v. Catrett¸* 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Once the movant meets its initial burden, the burden shifts and the nonmovant may defeat the

---

[21] Defendant argues that "[t]o the extent that Plaintiff is arguing that an adverse employment occurred when she was advised by Jennifer Devine to write an internal correspondence when she refused to work mandated overtime, it is undisputed that Plaintiff was not singled out and that she was not the only one who was told to do that." (*Id.*)

motion only by adducing evidence of specific facts that raise a genuine issue for trial.  Fed. R.

Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*¸ 316 F.3d 93, 100 (2d Cir. 2002).

"The Court is to believe the evidence of the non-movant and draw all justifiable

inferences in her favor, but the non-movant must still do more than merely assert conclusions

that are unsupported by arguments or facts."  *Sosa v. New York City Dep't of Educ.*, 406 F. Supp.

3d 266, 268 (E.D.N.Y. 2019) (internal citations omitted).  The role of the court at the summary

judgment stage is not to resolve disputed issues of fact, but merely undertake an analysis to

identify whether triable issue of fact exist.  *See Kee v. City of New York*, 12 F.4th 150, 167 (2d

Cir. 2021).  That is, the court's function is "issue-finding," not "issue-resolution." *Carolina Cas.*

*Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v.*

*Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d. Cir. 1994)).  *Au fond*, the

court's role is to decide whether, "after resolving all ambiguities and drawing all inferences in

favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v.*

*N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (citing

*Anderson*, 477 U.S. at 248 and *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir.

2013)).

Viewing the facts presented here in the light most favorable to Plaintiff, the Court finds

Plaintiff failed establish: (i) a *prima facie* case of intentional discrimination under the ADA, (ii)

Defendants improperly refused to provide Plaintiff with a reasonable accommodation under the

ADA, (iii) retaliation under the ADA, and (iv) disparate impact under the ADA, and therefore

grants Defendant's Motion for Summary Judgment on all Counts asserted in the Complaint.[22]

---

[22] The Court notes it is well established that "[a] claim of disability discrimination under the New York
State Human Rights Law, N.Y. Exec. Law §§ 290–301 is governed by the same legal standards as govern
federal ADA claims." *Graves v. Finch Pruyn & Co*., 457 F.3d 181, 184 (2d Cir. 2006) (citing *Parker v.*

II.    **Intentional Discrimination**

"Section 102(a) of the ADA creates a private right of action for disability-based employment discrimination." *Graves v. Finch Pruyn & Co*., 457 F.3d 181, 183 (2d Cir. 2006) (citing 42 U.S.C. § 12112(a)). To bring a claim of disability discrimination under the ADA, plaintiff must establish that: (i) her employer is subject to the ADA; (ii) she is disabled within the meaning of the ADA; (iii) she was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (iv) she suffered an adverse employment action because of her disability. *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001); *Lewis v. Livingston Cty. Ctr*., 30 F. Supp. 3d 196 (W.D.N.Y. 2014); 42 U.S.C. § 12111(8) (a "qualified individual with a disability" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"). The burden-shifting analysis established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) applies in discrimination cases. *See McBride v. BIC Consumer Prods. Mfg. Co*., 583 F.3d 92, 96 (2d Cir. 2009).

Under this framework, a plaintiff first must be able to establish a *prima facie* case, and the burden then shifts to the defendant to set forth a "legitimate, non-discriminatory reason for the adverse employment action." *Brown v. Northrop Grumman Corp*., No. 12-CV-1488 (JS)(GRB), 2014 WL 4175795, at *5 (E.D.N.Y. Aug. 19, 2014) (citation omitted). If a defendant provides such a reason, the burden shifts back to the plaintiff who must "present competent evidence that the reasons offered by the defendants were not the true reasons, but were a pretext for discrimination or retaliation." *Id*. (citation omitted). Here, the parties do not dispute that Defendant is an "employer" within the meaning of the ADA, or that Plaintiff is

---

*Columbia Pictures Indus*., 204 F.3d 326, 332 n. 1 (2d Cir. 2000)). Thus, Plaintiff's "state-law disability-discrimination claim[s] survive[] or fail[] on the same basis as [her] ADA claim[s]." *Id*. at 184 n. 3.

"disabled" within the meaning of the ADA. *See generally*, ECF Nos. 34, 35. Accordingly, the Court addresses the third and fourth elements of the *prima facie* case turn.

A. **Essential Function**

*First*, the Court finds Plaintiff cannot show that she was qualified to perform the essential functions of a PSD I, without or without reasonable accommodation. "A disabled individual is qualified for a particular position if he can perform the essential functions of the job with or without reasonable accommodation." *Rodal v. Anesthesia Grp. of Onondaga, P.C*., 369 F.3d 113, 120 (2d Cir. 2004) (citing *Shannon v. New York City Transit Auth*., 332 F.3d 95, 99–100 (2d Cir. 2003)) ("A modified work schedule may constitute a reasonable accommodation in certain circumstances."); *see also* 42 U.S.C. § 12111(9)(B) (a "part-time or modified work schedule[]" constitutes a "reasonable accommodation"). However, "a scheduling accommodation is *not* reasonable if it, in essence, requires an employer to eliminate an essential function of a job." *Rodal*, 369 F.3d at 120 (emphasis added); *Shannon*, 332 F.3d at 100 ("A reasonable accommodation can *never* involve the elimination of an essential function of a job.") (emphasis added).

To this end, the question of whether Plaintiff was qualified for her position as a PSD I turns on whether working overtime was an "essential function" of her position. *See e.g., Schroeder v. Suffolk Cnty. Cmty. Coll.*, No. 07-CV-2060(JFB)(WDW), 2009 WL 1748869, at *11 (E.D.N.Y. June 22, 2009) ("An accommodation is not reasonable if it requires eliminating one of the essential functions of the relevant job, because an individual with disabilities is not 'qualified' under the statute if accommodating that individual would require modification of the essential job functions.").

20

"Essential functions," is "generally defined in ADA regulations promulgated by the [EEOC] to mean the 'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) (quoting 29 C.F.R. § 1630.2(n)(1) (1996)) ("A job function may be considered essential" because: (i) "the reason the position exists is to perform that function[;] (ii) "of the limited number of employees available among whom the performance of that job function can be distributed[;]" and/or (iii) "[the] function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function."). To determine whether a certain task is an essential function of a particular job, "a court must conduct a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013) (internal quotation omitted); *Shannon*, 332 F.3d at 100 (internal citations omitted) ("In approaching this inquiry, a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position.").

"But ultimately, the question whether a task constitutes an essential function depends on the totality of the circumstances." *Rodal*, 369 F.3d at 120. Factors *relevant* – but not dispositive – to determining whether a job function is essential include: (i) the employer's judgment as to which functions are essential; (ii) written job descriptions; (iii) the amount of time spent on the job performing the function; (iv) the consequences of not requiring the plaintiff to perform the function; (v) the terms of any collective bargaining agreement; (vi) the work experience of past employees in the job; and (vii) the work experience of current employees in similar jobs. *See Stone*, 118 F.3d at 97 (citing 29 C.F.R. § 1630.2(n)); *Baker v. AVI Food Sys., Inc.*, No. 10-CV-159, 2017 WL 6603646, at *4 (W.D.N.Y. Dec. 27, 2017) ("In the Second Circuit, however,

greater weight is often given to third, [sixth and seventh] factors, as they evidence how the job was actually performed."). Therefore, "[a]ctual time on the job and the experience of predecessors and successors to [Plaintiff's] position are the more important considerations for this Court's analysis." *Id.*

With respect to the first factor, it is the SCPD's position that PSD I employees must be able to work overtime due to the nature of the position. According to Defendant:

> The SCPD Communications Section is a 365 day a year, 24 hour per day, 7 day a week unit, meaning that is fully operational and must be staffed at all times. In the unit, there is a PSD assigned to every radio band in Suffolk County, and, in addition to the PSDs that are actively on the radio, the Communication Section requires that there are additional PSDs on duty, to ensure that the PSD's working the radios are able to take a break or a meal period. The radios must be manned at all times.

(ECF No. 34-1 at ¶ 53-54.) Defendant further explains that mandated overtime is specifically utilized when there are not enough PSD Is to reach minimum staffing levels and no employees volunteered to work overtime in order to meet their minimum staffing levels. (*Id.* at ¶ 16.) Specifically, "the overtime mandate occurs when the squad runs out of employees who volunteer for overtime and there are still positions that need to be filled in order to keep the department running." (*Id.* at ¶ 23.) Defendant concludes working mandated overtime "is a core function of the job of a PSD I, since the 911 [C]all [C]enter is an emergency operations center" and that "[i]n order to keep the emergency operations functional[,] staffing must be maintained." (*Id.* at ¶¶ 22, 24.)

As previously mentioned, the Court "give[s] considerable deference" to the SCPD's "judgment regarding what functions are essential" for a PSD I, and further notes that other federal court decisions involving public safety dispatchers have reached the same conclusion – that overtime is an essential function of the position. *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998); *see also McNeil v. Union Pac. R.R. Co.*, 936 F.3d 786, 791 (8th Cir. 2019)

22

(holding plaintiff was not qualified for the dispatcher position as a matter of law, because she was unable to work mandatory overtime); *Wyatt v. Maryland Inst*., No. CIV.A. RDB-10-2584, 2012 WL 739096, at *8 (D. Md. Mar. 7, 2012) ("[Defendant's] concern for the safety and security of its community and property required the presence of round the clock security personnel. The ISO/Dispatcher position was implemented to ensure the safety and security of [Defendant's] campus as a whole. Additionally, all ISO/Dispatchers were scheduled on a rotating basis to ensure their constant and uninterrupted presence on campus. As such, it is clear that mandatory overtime is an essential function of the ISO/Dispatcher position."). Accordingly, "[t]he first factor weighs in favor of finding overtime to be an essential function of" the PSD I position. *Baker v. AVI Food Sys., Inc.*, No. 10-CV-159, 2017 WL 6603646, at *5 (W.D.N.Y. Dec. 27, 2017) (noting that while defendant's opinion that overtime was an essential function of plaintiff's manager position was "not controlling," "it should be given some deference").

As to the second factor, while Plaintiff's PSD I Job Description does not specifically state that the ability to work overtime is an essential function of the position, the 2009 SCPD Department Directive and the Overtime Mandate Memo explicitly state that overtime is mandatory for all employees of the SCPD, and do not provide for medical exemptions. (ECF Nos. 34-7 at 2-3, 35-7 at 1.) Additionally, according to Defendants, when PSD Is are hired, they are notified at orientation that "[i]n order to keep the emergency operations functional[,] [overtime] staffing must be maintained." (ECF No. 34-1 at ¶¶ 22, 24.) *See e.g.*, *Baker*, No. 10-CV-159, 2017 WL 6603646, at *5 (finding overtime was an essential function of plaintiff's office manager position even though the written description of the position did not include overtime as an essential function); *Wyatt*, No. CIV.A. RDB-10-2584, 2012 WL 739096, at *7 ("[T]he Staff Handbook, the Campus Safety Operations Manual and personnel memoranda

indicate that [Defendant] considered mandatory overtime as an essential function of the ISO/Dispatcher position."); *McNeil*, 936 F.3d at 790 (noting the company's scheduling and attendance guidelines state that overtime was "mandated," and citing the fact that schedules "included multiple layers of redundancy to ensure staff availability for overtime work" in finding overtime was an essential function of plaintiff's dispatcher position.) Therefore, the second factor weighs in favor of finding overtime to be an essential function of a PSD I.

The third and fourth factors – the amount of time spent on the job performing the function and the consequences of not requiring Plaintiff to perform the function – also weigh in favor of Defendant. As previously mentioned, according to the SCPD's overtime provisions and policies, all employees were considered part of a mandatory overtime "pool" – in which all PSD Is are *required* to work overtime on days when there are not enough PSD I's to reach minimum staffing levels and no employees volunteered to work overtime, in order to meet their minimum staffing levels. (*See* ECF No. 34-1 at ¶ 16.) It is undisputed that Plaintiff was mandated to work overtime between 1997 and 2013, and that "[t]here was never a time before 2013 that Plaintiff was mandated to work overtime that she did not work the overtime." (*Id*. at ¶ 25.) As Plaintiff testified in her deposition, she was continuously called upon to work mandatory overtime between 1997 and 2013:

Q:      Were you ever mandated to work overtime from 1997 to 2013?

A:      Yes.

Q:      Okay. And how many times during that period, if you know, were you mandated to work overtime, approximately?

A:      I couldn't even count.

***

24

> Q:    [T]he year between May 2012 and May 2013, do you recall how many times you
>        were mandated to work overtime?
>
> A:    No.
>
> Q:    Was it more than five?
>
> A:    It could have been. I worked [voluntary and mandatory] overtime all the time, so I
>        don't recall how many mandates.

(ECF No. 34-4 at 16.) To this end, Plaintiff and other PSD Is could be called upon to work

overtime on a regular basis – at any point of their workweek or work-day – as often as needed by

the SCPD:

> Q:    When would you find out that you were mandated to work overtime?
>
> A:    Usually earlier in the day.

(*Id*. at 17.)

Where, as here, "the demands of the job require working overtime on a regular basis,

other courts have held that overtime constitutes an essential function of the job." *Zaborowski v.

Sealright Co.*, No. 5:00-CV-771(HGM/DEP), 2002 WL 1585521, at *4 (N.D.N.Y. July 9, 2002)

(collecting cases) (holding working extensive overtime was an essential function of plaintiff's

position as Shipping Supervisor, where "[a]s far back as 1997, plaintiff regularly worked more

than 50 hours per week as one of three Shipping Supervisors at the Fulton facility."); *Davis v.

Bombardier Transp. Holdings (USA) Inc.*, No. 11-CV-0782 RRM RER, 2013 WL 6816605, at

*11 (E.D.N.Y. Dec. 24, 2013), *aff'd*, 794 F.3d 266 (2d Cir. 2015) (holding where overtime was

only required during emergency conditions, and plaintiff was asked "on a few occasions" to

perform mandatory overtime work due to emergency conditions, "such overtime must be

considered an essential job requirement."); *McNeil*, 936 F.3d at 788 (finding overtime to be an

essential function of a dispatcher where "the dispatcher may be expected to work overtime if

another employee fails to show up to work" and "[i]n that situation, a dispatcher is required to work up to four additional hours either before or after her original shift."); *Baker*, No. 10-CV-159, 2017 WL 6603646, at *5 (holding overtime was an essential function of the office manager position where the office manager "[a]s a practical matter . .. worked overtime almost all the time" and where plaintiff herself "worked overtime [as an office manager] ninety-one percent of her workdays"); *C.f. Kosack v. Entergy Enterprises, Inc.*, No. 14 CV 9605 (VB), 2019 WL 330870, at *10 (S.D.N.Y. Jan. 25, 2019) (finding overtime was not an essential function where it remained "unclear" whether mandated overtime was "a regular occurrence or an anomaly").

Ultimately, not requiring Plaintiff to perform the overtime function indefinitely would eventually result in a shortage of available PSD I workers to take 911 calls in emergency situations. *See* ECF No. 34-19 at ¶ 74 (Ms. Devine testified that department "could not leave unfilled seats-in order for the command to run, those seats had to be filled, and those seats could be filled with either volunteers, [overtime] mandates, or the possibility of hiring additional personnel.");[23] *Stone*, 118 F.3d at 97 ("The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed"); *Wyatt*, No. CIV.A. RDB-10-2584, 2012 WL 739096, at *9 (eliminating mandatory overtime only for plaintiff was "not operationally feasible" for defendant "given the limited number of available employees," and where "all the ISO/Dispatchers were asked to work that shift and received their assignment based on a 'reverse seniority method.'"); *McNeil*, 936 F.3d at 790 (noting if dispatcher were unable to work overtime, "then either other employees would

---

[23] The Court notes while Ms. Devine presented hiring additional personnel as an option to "fill seats," at the SCPD, "it is well established that the ADA does not require an employer to hire an additional person to perform an essential function of a disabled employee's position." *Wyatt*, No. CIV.A. RDB-10-2584, 2012 WL 739096, at *8.

have to work overtime more often or the safety of Union Pacific operations would be impaired.").

The terms of the CBA additionally support Defendant's contention that overtime is an essential function of a PSD I. The CBA explicitly provides:

> Overtime work, as an opportunity, in the same or related title shall be equalized among Departmental employees as far as is practical. *Department Heads and supervisors may require the performance of overtime or "called-in" work for reasonable periods as an obligation in cases where, because of seasonal or extraordinary requirements related to the job or because of the absence of normal personnel for whatever reason, the work is necessary to meet the normal work demands of the function of the Department or some emergency exists.* Seniority shall be a criterion in the selection of employees for overtime, provided that the employees have the ability to do the work.

(ECF No. 35-5 at 9-15) (emphasis added).[24] *See Davis*, No. 11-CV-0782 RRM RER, 2013 WL 6816605, at *11 (holding mandatory overtime was an essential function of plaintiff's position as an air train assistant ("ATA") where the plaintiff and other employees were required per the

---

[24] Plaintiff primarily relies on the CBA's language to argue that overtime is not an essential function PSD I. *Preliminarily*, as previously stated, the CBA's language is not dispositive on the issue, and was nevertheless in effect only from January 1, 2004 to December 31, 2008, prior to the SCPD's implementation of the Overtime Mandate Memo and the 2009 SCPD Department Directive. Moreover, as Defendant clarified at Oral Argument, the CBA applies generally to all Suffolk County employees and is not specific to the SCPD Communications Department. (ECF No. 36.) The CBA appears to require mandatory overtime for all employees, yet, at the same time, presents a willingness to accommodate a mandatory overtime restriction. However, "[a]n employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous." *Rehrs v. Iams Co*., 486 F.3d 353, 358 (8th Cir. 2007) (internal quotation omitted); *Phelps v. Optima Health, Inc*., 251 F.3d 21, 26 (1st Cir. 2001) (internal citations omitted) (collecting cases) ("[Evidence that accommodations were made so that an employee could avoid a particular task merely shows the job could be restructured, not that the function was non-essential. To find otherwise would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of employers."). Plaintiff's medical note supporting her "no overtime" request did not include an end date or otherwise specify that the restriction was temporary. (ECF No. 34-19 at ¶ 22.) The Court finds "[t]he request for a permanent or indefinite accommodation present[s] a different and greater burden" on the SCPD, and, nevertheless, any "earlier willingness [by the SPCD] to accommodate a [more limited] restriction does not create a genuine issue of fact about whether availability for overtime is an essential function." *McNeil*, 936 F.3d at 790.

ATA collective bargaining agreement to work overtime in "emergency conditions" and to "compensate for staff deficiencies").

Finally, a consideration of the last two factors – the work experience of past employees in the job and the work experience of current employees in similar jobs – supports Defendant's contention that overtime is an essential function of the PSD I position. Defendants maintain that overtime is now, and has previously been, mandated for all PSD I employees. *See* ECF No. 34-1 at ¶ 18 ("There has been an overtime mandate in the Suffolk County Police Department since at least 1998"). In support, Defendants proffer Ms. Devine, Mr. Sommeso, and Collen Jaen, who were all former PSD Is, and "worked both voluntary and mandated overtime during the time [they were] PSD I[s]." (*Id.* at ¶¶15, 21, 52.)

Plaintiff failed to offer any current or former PSD I that was excused from the overtime mandate. *See generally*, ECF No. 35-1. Plaintiff herself conceded that she worked overtime (either volunteer or mandatory) "all the time" between May 2012 to May 2013, approximately one-year prior to her retirement. (ECF No. 34-4 at 16.) *See e.g.*, *Davis*, No. 11-CV-0782 RRM RER, 2013 WL 6816605, at *4 (emphasis added) (finding overtime was an essential function where, "[d]uring 2008 and 2009, *several* [of defendant's] employees, including [plaintiff], were asked on a few occasions to perform mandatory overtime work due to emergency conditions."); *Baker*, No. 10-CV-159, 2017 WL 6603646, at *5 (holding plaintiff's own experience—as well as the experience of her predecessor and successor— "demonstrated that overtime indeed was essential to her job," where plaintiff herself worked overtime ninety-one percent of her workdays, her predecessor worked overtime ninety-three percent of her workdays and her successor worked overtime ninety-five percent of her workdays); *Zaborowski*, No. 5:00-CV-771(HGM/DEP), 2002 WL 1585521, at *5 (holding overtime to be an essential function of

28

plaintiff's position as a shipping supervisor, where plaintiff and other shipping supervisors were continuously working more than 50 hours per week); *Wyatt*, No. CIV.A. RDB-10-2584, 2012 WL 739096, at *7 (finding overtime to be an essential function of plaintiff's dispatcher position and noting "the record indicates that all ISO/Dispatchers were required to work overtime shifts").

In *McNeil*, the Eighth Circuit specifically rejected plaintiff's argument that mandatory overtime could not be an essential function of the dispatcher job even where defendant had accommodated other employees who also had overtime restrictions. 936 F.3d 786, 790–91. The Court noted:

> Although these employees could not be available for up to four hours of overtime, as was typically expected, they could work *some* overtime. They could occasionally manage incoming calls that extended beyond a shift change or cover for absent employees for some duration on certain occasions. [Plaintiff's] restriction allowed none of this activity. [Defendant's] accommodation of the other employees thus does not undermine its position that ability to work mandatory overtime is an essential function.

*Id*. Similarly*,* here, Plaintiff has refused to work any overtime, and she has not shown any similarly situated individuals who Defendant has offered that accommodation to.  By contrast, Defendants have shown that the mandatory overtime requirement has been applied uniformly to all former and current PSD Is. Accordingly, as all seven factors weigh in favor of a finding that overtime is an essential function of a PSD I, and, "the evidence [otherwise] establishes that the demands of plaintiff's position necessitated her working more than eight hours per day on a regular basis[,]" the Court concludes that working more than eight hours per day was an essential function of Plaintiff's PSD I position. *Baker*, No. 10-CV-00159 A M, 2011 WL 6740544, at *10.

In support of her argument that mandated overtime was not an essential function of her job, Plaintiff primarily relies on: (i) *Lewis v. Livingston County Ctr*., 30 F. Supp.3d 196 (W.D.N.Y. 2014) ("*Lewis*"), (ii) *Wilkie v. Luzerne Cnty.,* No. 3:14CV462, 2016 WL 4921032, at *1 (M.D. Pa. Sept. 14, 2016) ("*Wilkie*"), and (iii) *Colpoys v. County of Erie*, 2013 WL 5437635

(W.D.N.Y. Sept. 27, 2013) ("*Colpoys*"). (ECF No. 35-1 at 19-20.) The Court notes that *Lewis*

and *Colpoys* were decided at the motion to dismiss stage – not summary judgment – and that all

three cases are otherwise factually distinguishable from the instant case. Specifically, in *Lewis*,

the Court opined:

> [W]hether the ability to work mandated overtime is an essential function of Plaintiff's
> employment is a fact-specific inquiry that the Court is unable to decide on a motion to
> dismiss. Instead, the court must undertake a case-by-case inquiry that considers, among
> other factors, the effectiveness of the modification in light of the nature of the disability
> in question and the cost to the organization that would implement it. Defendant cites
> various cases in this district where mandatory overtime was found to be an essential
> function of a plaintiff's employment. However, those cases were decided at the summary
> judgment stage, where further evidence was available regarding whether a particular facet
> of a plaintiff's employment was essential.

30 F. Supp. 3d 196, 209 (internal citations omitted) (holding dismissal was premature on

plaintiff's ADA disability claim because a material issue of fact existed as to whether overtime is

an essential function of plaintiff's position, where plaintiff alleged that other employees were in

fact not required to work eight hours beyond the standard eight-hour shift but were required to

work shorter overtime periods and that she was permitted to work a modified schedule on some

occasions); *Colpoys*, No. 12-CV-908S, 2013 WL 5437635, at *5 (holding the same, where

plaintiff alleged other employees were not required to perform overtime, and plaintiff himself

was permitted to work a modified schedule at one point);[25] *Wilkie*, No. 3:14CV462, 2016 WL

4921032, at *3 ("Here, [defendant] only challenges whether plaintiff is disabled under the

ADA[,]" and not whether plaintiff was qualified for the position under the ADA). Thus, the

---

[25] In *Colpoys*, the Court further noted that "the employer's judgment as to whether a function is essential
is but one factor among many. The ADA regulations set forth other factors to consider . . . [which] cannot
be weighed without further fact-finding. The many cases on which [defendant] relies do not compel a
different result. Tellingly, all but one reflect a decision reached on a motion for summary judgment,
where the facts and circumstances of the particular job at issue—the 'totality of the circumstances'—can
be weighed." *Id.*

Court finds "Plaintiff has failed to meet [her] burden to establish the third element of a *prima facie* case of disability discrimination under the ADA, namely that [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation." *Zaborowski*, No. 5:00-CV-771(HGM/DEP), 2002 WL 1585521, at *5.

### B.   Adverse Employment Action

*Second*, the Court finds Plaintiff cannot show she suffered an adverse employment action because of her disability.  An "adverse employment action" is defined as "a materially adverse change in the terms and conditions of employment." *Caskey v. Cnty. of Ontario*, 560 F. App'x 57, 58–59 (2d Cir. 2014) (internal citations omitted) ("Examples of such materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."). "[A]dverse employment actions" must show some inference of discrimination to prevail on a claim under the ADA.  *See Flieger v. E. Suffolk BOCES*, 693 Fed. Appx. 14, 17 (2d Cir. 2017).  The Second Circuit has characterized an adverse employment action as more than an inconvenience or changing of job duties but could be based on a case's unique circumstances.  *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 72 (2d Cir. 2019) (finding no adverse employment action where plaintiff alleged a transfer from greeter to cashier, was unable to take a break on two occasions, and did not demonstrate constructive discharge). "An adverse employment action may also take the form of a constructive discharge, which occurs 'when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Id*. (quoting *Morris v. Schroder Capital Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007).

Where, as here, "the plaintiff was not actually fired, she may establish constructive discharge if she can show that her employer made her working conditions so difficult or unpleasant that a reasonable person in the plaintiff's position would have felt compelled to resign." *Serdans v. Presbyterian Hosp. in City of New York*, No. 09-CV-1304 PGG, 2011 WL 4443956, at *8 (S.D.N.Y. Sept. 26, 2011); *see* ECF No. 34-1 at ¶ 50 (It is undisputed that Plaintiff voluntarily retired from her position as a PSD I in September 2014); *Ciullo v. Yellow Book, USA, Inc*., No. 10-CV-4484 CBA VVP, 2012 WL 2676080, at *9 (E.D.N.Y. July 6, 2012) (quoting *Stetson v. NYNEX Service Co.,* 995 F.2d 355, 360–361 (2d Cir. 1993) ("A constructive discharge requires working conditions 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' This is a high threshold to meet, and generally, a constructive discharge cannot be established simply through evidence that an employee was dissatisfied with the nature of his assignments . . .[n]or is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant.").

Plaintiff has not otherwise presented any facts or circumstances to suggest that she was constructively discharged from her position as a PSD I.  Following Plaintiff's return from medical leave, Ms. Devine advised Plaintiff to write internal correspondence to Capt. Kevin Degnan of the SCPD – as Ms. Devine did with all other PSD Is – to indicate that Plaintiff was requesting to be exempt from two mandated overtime shifts. (ECF No. 34-19 at ¶ 33.) Plaintiff wrote internal correspondence to Capt. Degnan of the SCPD on two occasions advising him that she "did not physically feel up to overtime" and that she was "unable to work mandated overtime . . as per [her] Doctors orders" (ECF Nos. 34-10, 34-11), and on both occasions in which she was mandated, Plaintiff did not work the overtime, as indicated by her time sheets, and someone else

was mandated on those days. (ECF No. 34-1 at ¶¶ 39-42.) Plaintiff was never disciplined for refusing to work the overtime on either day. (*Id*. at ¶ 44.)

Plaintiff's claim that she was somehow "forced" to retire in light of the SCPD's mandatory overtime policy is unavailing and unsupported by the record. *See e.g.*, *Caskey*, 560 F. App'x 57, 59 (internal citations omitted) (rejecting plaintiff's argument that she was "compelled" to retire, where "[t]he complaint, however, [was] bereft of any factual allegations to render those assertions plausible," and where "none of the [changes in her work responsibilities] constitute[d] a materially adverse change in the terms and conditions of her employment."); *Ciullo*, No. 10-CV-4484 CBA VVP, 2012 WL 2676080, at *9 ("[Plaintiff] has not even alleged that a supervisor threatened him with termination, but makes only the vague speculation that if he did not meet his sales goals, he could have been terminated at some point in the future. A factfinder simply could not infer from that a reasonable employee [in plaintiff's position] would have felt compelled to resign" or that plaintiff's work environment was "unbearable."); *Davis*, No. 11-CV-0782 RRM RER, 2013 WL 6816605, at *11–12 (holding defendant's imposition of mandatory overtime for all employees did not constitute an adverse employment action, and noting that in any event, "plaintiff refused to perform the overtime work and was not penalized for her refusal"). Accordingly, the Court finds Plaintiff did not suffer an adverse employment action under the ADA.

## III.   **Failure to Accommodate**

"An employer may also violate the ADA by failing to provide a reasonable accommodation." *McMillan v. City of New York*, 711 F.3d 120, 125–26 (2d Cir. 2013).  To assert a failure to accommodate claim, plaintiff must establish: (i) she is a person with a disability under the meaning of the ADA; (ii) an employer covered by the statute had notice of his

disability; (iii) with reasonable accommodation, she could perform the essential functions of the job at issue; and (iv) her employer has refused to make such accommodations. *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006).

"In discrimination claims based both on adverse employment actions and on failures to accommodate, the plaintiff 'bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [her] to perform the essential functions of [her] employment.'" *McMillan*, 711 F.3d at 126 (2d Cir. 2013) (quoting *McBride v. BIC Consumer Prods. Mfg. Co*., 583 F.3d 92, 97 (2d Cir. 2009)). Here, the parties do not dispute the first and second elements (*see generally*, ECF Nos. 34, 35), and therefore, the Court addresses the third and fourth elements in turn. *See Graves*, 457 F.3d at 184 ("[T]o establish the third and fourth elements of [her] *prima facie* case, [Plaintiff] must show that [s]he could fulfill the essential job functions with reasonable accommodations that were refused by [Defendant]).

*First*, Plaintiff's request to be indefinitely exempt from Defendant's mandatory overtime policy "cannot constitute a reasonable accommodation because the [C]ourt has already concluded that overtime was an essential function of [P]laintiff's position" as a PSD I, "and any limitation on the amount of overtime worked would impermissibly eliminate a portion of the position's essential functions." *Zaborowski*, No. 5:00-CV-771(HGM/DEP), 2002 WL 1585521, at *5. Thus, the Court finds Plaintiff failed to establish the third element of her *prima facie* case. *Second*, the Court finds Defendant did not improperly refuse to provide Plaintiff with a reasonable accommodation. In *Borkowski v. Valley Cent. School Dist.,* the Second Circuit articulated that the Plaintiff bears the burden of production in identifying a reasonable accommodation when raising a reasonable accommodation claim:

> First, the plaintiff bears the burden of proving that she is otherwise *qualified*; if an accommodation is needed, the plaintiff must show, as part of her burden of persuasion,

that an effective accommodation exists that would render her otherwise *qualified*. On the issue of reasonable accommodation, the plaintiff bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits. These two requirements placed on the plaintiff will permit district courts to grant summary judgments for defendants in cases in which the plaintiff's proposal is either clearly ineffective or outlandishly costly.

63 F.3d 131, 138-40 (2d Cir. 1995) (emphasis added); *Tillman v. Verizon New York, Inc*., 118 F. Supp. 3d 515, 538–39 (E.D.N.Y. 2015) (internal citations omitted) ("[T]he plaintiff bears the burden of proving ... that an accommodation exists that permits her to perform the job's essential functions. If the plaintiff meets that burden, the analysis shifts to the question whether the proposed accommodation is reasonable."). Only "[o]nce a disabled individual has suggested to his employer a reasonable accommodation," then "the employer must engage in an informal, interactive process with the disabled individual to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Martinsky v. City of Bridgeport*, 814 F. Supp. 2d 130, 147–48 (D. Conn. 2011), *aff'd*, 504 F. App'x 43 (2d Cir. 2012) ("This interactive process requires that the employer make a good faith effort to participate in that discussion."). In *McBride v. BIC Consumer Products Mfg. Co., Inc.,* the Second Circuit specifically "held that an employer's failure to engage in a sufficient interactive process cannot alone form the basis of a claim under the ADA, rather to avoid summary judgment, a plaintiff must also establish that he or she was qualified for the position at issue." 583 F.3d 92 (2d Cir. 2009); *Id*.

Here, Plaintiff failed to suggest to the SCPD a reasonable accommodation, as her request to be exempt from overtime indefinitely required "eliminating one of the essential functions" of a PSD I. *Schroeder*, No. 07-CV-2060(JFB)(WDW), 2009 WL 1748869, at *11 ("An accommodation is not reasonable if it requires eliminating one of the essential functions of the relevant job, because an individual with disabilities is not 'qualified' under the statute if

accommodating that individual would require modification of the essential job functions.");
*McNeil*, 936 F.3d at 791 ("[Plaintiff] knew that the company believed her restriction was a long-term restriction, and she never arranged for a follow-up communication from her doctor. Her failure to do so "supports the conclusion that she, not [Defendant], stalled the interactive process."); *Bost v. Nassau Cnty. Dep't of Soc. Servs*., No. 22-2547, 2023 WL 6366053, at *2 (2d Cir. Sept. 29, 2023) (internal citations omitted) ("The ADA "envisions an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated . . .[a]nd where a breakdown in interactive process was manifestly the employee's fault, a failure-to-accommodate claim fails.").

To this end, the SCPD was not required under the ADA to engage in the interactive process in response to receiving Plaintiff's internal correspondence and doctor's note.[26] *See Noll v. Int'l Bus. Machines Corp*., 787 F.3d 89, 98 (2d Cir. 2015) (internal citations omitted) ("[F]ailure to engage in an interactive process does not form the basis of an ADA claim in the absence of evidence that accommodation was possible. That is because the ADA imposes liability for discriminatory refusal to undertake a feasible accommodation, not mere refusal to explore possible accommodations where, in the end, no accommodation was possible."); *Tillman,* 118 F. Supp. 3d at 538–39 ("[E]vidence of an employer's failure to engage in an interactive process does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue."); *McNeil*, 936 F.3d at 791 (affirming the district court's ruling that defendant was not liable for breach of the duty to engage in the interactive process because "no reasonable

---

[26] Plaintiff concedes that she did follow up to ensure the Grievance Form was submitted to the SCPD, and the SCPD otherwise maintains that it did not receive it. (ECF No. 34-4 at 33.)

accommodation was available."). As such, the Court finds Plaintiff additionally failed to meet the fourth element of her *prima facie* case for failure to accommodate under the ADA.

## IV.    <u>Retaliation</u>

Title VII of the Civil Rights Act of 1964 "prohibits an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington Northern and Sante Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e—3(a)).  Under this section of Title VII, referred to as the antiretaliation provision, "discriminate against" has been interpreted to mean that an "employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id*. at 57. Similar to discrimination claims under the ADA, retaliation claims are also analyzed using the *McDonnell-Douglas* framework. *See Eustache v. Home Depot U.S.A., Inc*., No. 13-CV-42L (SJF)(AKT), 2014 WL 4374588, at *31 (E.D.N.Y. Sep. 2, 2014) *adopting report and recommendation*, *aff'd*, 621 Fed. App'x. 86 (2d Cir. 2015) (citation omitted).

To make out a *prima facie* retaliation claim under Title VII, a plaintiff must demonstrate that "(1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012).  "To prove the required causal link, [plaintiff] must establish that the employer's retaliatory motive was a but-for cause of the adverse action." *Husser v. N.Y.C. Dep't of Educ*., 137 F. Supp. 3d 253, 271–72 (E.D.N.Y. 2015) (adopting report and recommendation) (internal quotation marks and citations omitted).  When determining whether summary judgment is

appropriate, the court must only determine "whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id*. at 272 (citation omitted). Because this Court has already concluded "that there was no actual or constructive discharge that resulted in [Plaintiff's] retirement," (*see supra*, II.B) it therefore concludes "no plausible cause of action for ADA retaliation" exists here. *Caskey v. Cnty. of Ontario*, 560 F. App'x at 59.

## V.   <u>Disparate Impact</u>

The Second Circuit analyzes claims of disparate impact under the ADA "under a modified version of the burden-shifting analysis usually applied to employment discrimination cases under Title VII of the Civil Rights Act of 1964." *Quad Enterprises Co., LLC v. Town of Southold*, 369 F. App'x 202, 205–06 (2d Cir. 2010) (collecting cases). To establish a *prima facie* case, the plaintiff must show: (i) "the occurrence of certain outwardly neutral practices," and (ii) "a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Id*. (internal citations omitted) ("Although the plaintiff need not show discriminatory intent under this theory, it must prove that the practice actually or predictably results in discrimination. Moreover, there must be a causal connection between the policy at issue and the discriminatory effect."). Specifically:

> The plaintiff must prove the practice actually or predictably results in discrimination. The mere inference of discriminatory intent does not satisfy this burden. Further, the plaintiff must demonstrate that the facially neutral policy and the alleged discriminatory result are causally connected. Once the plaintiff has made this *prima facie* showing, the burden then shifts to the defendant to prove that its actions furthered, in theory and in practice, a legitimate, *bona fide* governmental interest and that no alternative would serve that interest with less discriminatory effect.

*Grana v. Potter*, No. 06-CV-1173(JFB)(ARL), 2009 WL 425913, at *14 (E.D.N.Y. Feb. 19, 2009) (internal citations omitted); *Calabritto v. Dillon*, 920 F. Supp. 370, 374–75 (E.D.N.Y.

1996), *aff'd*, 107 F.3d 2 (2d Cir. 1997) (cleaned up) ("The evidence in disparate impact cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities."); *Sweeney v. U.S. Postal Serv.*, No. CV 08-4417 ARL, 2013 WL 5744490, at *14 (E.D.N.Y. Oct. 23, 2013) (internal quotations omitted) ("The statistics must reveal that the disparity is substantial or significant, and must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity. Thus, the statistics must reflect a disparity so great that it cannot be accounted for by chance."); *Fulton v. City of New York*, No. 20-CV-144 (WFK) (PK), 2021 WL 11716365, at *11 (E.D.N.Y. Mar. 15, 2021) (internal citations omitted) ("To the extent statistical analysis is required, Plaintiffs need only put forward data, which reveals disparities between populations that are relevant to the claim the plaintiff seeks to prove").

Here, the Court notes that Plaintiff has not proffered *any* evidence to prove disparate impact, as she has presented no statistical evidence nor made any comparison between groups in order to determine if an alleged protected group has been impacted differently than the other group of individuals. *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2523 (2015) ("A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a *prima facie case* of disparate impact."); *Fulton*, No. 20-CV-144 (WFK) (PK), 2021 WL 11716365, at *11. This was further conceded at Oral Argument.

Even if Plaintiff had satisfied her *prima facie* burden, Defendant nonetheless showed a legitimate interest in implementing the mandatory overtime policy for all PSD Is, and that no alternatives would be available. Defendant maintains that working overtime is an essential function of the job of a PSD I, and that in order for the unit where Plaintiff worked as a PSD I to

39

be properly staffed at all times, overtime was mandatory for all unit employees and applied universally to all employees. *See* ECF No. 34-2 at 20. Plaintiff has presented no evidence to the contrary. *Raytheon Co. v. Hernandez*, 124 S. Ct. 513, 520 (2003) ("If petitioner did indeed apply a neutral, generally applicable no-rehire policy in rejecting respondent's application, petitioner's decision not to rehire respondent can, in no way, be said to have been motivated by respondent's disability."); *Texas Dep't of Hous. & Cmty. Affs.*, 135 S. Ct. at 2524 ("[L]imitations on disparate-impact liability discussed are also necessary to protect potential defendants against abusive disparate-impact claims. [A]s to governmental entities, they must not be prevented from achieving legitimate objectives, such as ensuring compliance with health and safety codes.); *C.f. Grana*, No. 06-CV-1173(JFB)(ARL), 2009 WL 425913, at *14 (denying defendant's motion for summary judgment on the issue of disparate impact liability under the ADA where plaintiff presented evidence that the overtime policy in question "targeted 'light duty' employees, or those unable to perform certain physical tasks," and where "defendant has made no showing of how this policy met any governmental need."). Therefore, the Court finds Plaintiff failed to show disparate impact under the ADA. *See Texas Dep't of Hous. & Cmty. Affs.*, 135 S. Ct. at 2523–24 ("[I]f the ICP cannot show a causal connection between the Department's policy and a disparate impact—for instance, because federal law substantially limits the Department's discretion—that should result in dismissal of this case.").

## VI.    **Supplemental Jurisdiction**

Federal courts "may decline to exercise supplemental jurisdiction over [pendent state law claims] if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  "Indeed, the Supreme Court has directed that, except in unusual circumstances, 'if the federal claims are dismissed before trial, even though not insubstantial in a

jurisdictional sense, the state claim should be dismissed as well.'" *Rosa v. Triborough Bridge & Tunnel Auth.*, No. 18-cv-1384 (BMC), 2019 WL 3718023, at *4 (E.D.N.Y. Aug. 7, 2019) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1996)); *see also Schiffman v. Epstein*, No. 04-cv-2661 (SCR) (LMS), 2009 WL 1787760, at *7 (S.D.N.Y. June 23, 2009) ("The strong preference in this Circuit is for district courts to decline to exercise supplemental jurisdiction under [section] 1367(c)(3) when all of the federal claims are dismissed from the suit prior to trial."). Courts should balance the "values of judicial economy, convenience, fairness, and comity" in considering whether to exercise supplemental jurisdiction. *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)).

These factors, on balance, weigh against exercising supplemental jurisdiction where no federal claims remain before trial. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 123 (2d Cir. 2006) (quoting *Cohill*, 484 U.S. at 350 n.7). Here, in absence of Plaintiff's ADA claims, there would be no other federal causes of action remaining before this Court. Additionally, as previously mentioned, Plaintiff's "state-law disability-discrimination claim[s] survive[] or fail[] on the same basis as [her] ADA claim[s]." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184, n.3 (2d Cir. 2006) ("A claim of disability discrimination under the New York State Human Rights Law, N.Y. Exec. Law §§ 290–301 is governed by the same legal standards as govern federal ADA claims.").

Thus, concerns of judicial economy, convenience, fairness and comity do not weigh in favor of retaining supplemental jurisdiction over the remaining state law claims. *See Espinosa v. Nassau Cnty. Corr. Ctr.*, 20-CV-00223 (GRB) (VMS), 2021 WL 826168, at *4 (E.D.N.Y. Mar. 3, 2021); *see also Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d, 198, 221 (E.D.N.Y. 2015)

(*adopting Report and Recommendation*) ("Having dismissed all federal causes of action . . . judicial economy, convenience, fairness and comity weigh against retaining supplemental jurisdiction over the remaining state law claims."); *Moscatelli v. Owl's Nest, Inc.*, No. 19-CV-4255(GRB) (AYS), 2021 WL 3577908, at *6 (E.D.N.Y. Aug. 12, 2021) (holding that judicial economy, convenience, fairness and comity weighed against retaining supplemental jurisdiction over remaining state law claims since federal causes of action were dismissed). Accordingly, because this Court grants summary judgment on all of Plaintiff's federal claims under the ADA, it declines to exercise jurisdiction over Plaintiff's remaining state law claims under the NYSHRL.

## **CONCLUSION**

For the reasons stated herein, Defendant's Motion for Summary Judgment (ECF No. 34) is **GRANTED** on all Counts asserted in the Complaint.  The Clerk of the Court is directed to close out the case.

Dated:  Central Islip, New York
May 1, 2024

S O   O R D E R E D:

/S/ *James M. Wicks*

JAMES M. WICKS
United States Magistrate Judge